UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Tanya Nunez, Administrator of ) | | |
| Estate of Cynthia L. Madden, deceased, ) | | |
| Plaintiff ) | | |
| ) | | |
| v. ) | | Case No. 09-4037 |
| ) | | |
| BNSF Railway Company, ) | | |
| Defendant ) | | |

# ORDER

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the court are the Defendant's motions to bar Plaintiff's two expert witnesses, James Sottile (#58) and Paul Bodnar (#56). The motions are fully briefed. As explained below, both motions are **GRANTED**.

## BACKGROUND

On the night of May 28, 2007, Cynthia Madden appeared to be having car trouble. Her car stalled several times, the last time at the point on Cleveland Road where it intersects with railroad tracks in Colona, Illinois. As Ms. Madden tried to re-start her car, two motorists in the area saw the crossing gates came down and the warning lights begin to flash. One of them heard a train horn blowing. Both of them observed that Ms. Madden did not immediately get out of her car. It was not until the train was visible to those at the crossing that Ms. Madden fled her car. She was too late. The train hit her car, which in turn struck her. She did not survive.

The train was a BNSF train. The engineer and conductor on board both recall that the train's headlights were on and that horn was sounded for more than 20 seconds before it entered the intersection. Both stated that the train, as it approached the intersection, was traveling under the allowable speed of 30 m.p.h. The conductor recalls seeing the closed gates and flashing lights at the intersection. They agree that, as Ms. Madden's car came into view, the train was immediately thrown into emergency mode, but it was not possible to stop the train in time.

The Cleveland Road crossing is protected by what is referred to as an "active warning system," meaning that as a train approaches the crossing, warning lights start flashing, gates automatically lower, and pedestrian bells ring. This system is triggered by circuits placed in the tracks that sense a train's approach. When a train is sensed, the system performs a rapid calculation, based on the train's speed and the distance to the intersection, that triggers the active warning system.

This warning system produces data (such as the train's speed and activation of the active warning system) that is transmitted to an event recorder.[1] There are two parts to this event recorder: the HXP-3, which operates the warning system and produces the data, and the HCR, which records the data and allows it to be downloaded to a computer and printed. When the event recorder is installed, there are various "options" that must be selected. In addition, the installer may select "daylight savings time" as an option. In the system at the Cleveland Road crossing, that option had not been selected, meaning that the recorded data did not reflect daylight savings time.

---

[1] An "event recorder" is a device that "(1) records train speed, hot box detection, throttle position, brake application, brake operations, and any other function the Secretary of Transportation considers necessary to record to assist in monitoring the safety of train operation, such as time and signal indication; and (2) is designed to resist tampering." 49 U.S.C. § 20137.

There is a second event recorder as well, this one found in the locomotive itself. This event recorder continuously records data specific to operation of the locomotive, including such data as speed, direction, and time. The specific locomotive on this train was BNSF 4708, which was manufactured in 1997.

About 2 hours after the accident, BNSF personnel downloaded the event recorder at the crossing. The morning after the accident, BNSF personnel downloaded the locomotive's event recorder. Plaintiff was provided with a copy of these downloads. In addition, BNSF tested the lights, horn and brakes on the locomotive. The original test results were no longer available by the time this litigation began. Federal regulations only require that the test results themselves be kept until the next test is conducted, but "in no case for less than one year from the date of the test." 49 C.F.R. §234.273. The Plaintiff was provided with a summary of the tests that BNSF conducted. This summary showed that no problems were found on the test conducted immediately after the accident.

Several days after the accident, Ms. Madden's children went to the scene to retrieve her personal belongings. While they were there, they heard a train horn and, using a cell phone and two wrist watches, they timed the arrival of the train at the crossing. One of the children testified that the arrival of the train at the crossing was 13-14 seconds and that the "lights came on two or three seconds before the train went through."

It was not until October 28, 2011, that Plaintiff retained 2 expert witnesses, Paul Bodnar and James Sottile. One or both of these experts, along with counsel for the parties and a BNSF representative, visited the Cleveland Road crossing site in November. In addition to viewing the physical layout of the scene of the accident, BNSF opened the "bungalow" that contains the HCR portion of the event recorder for the tracks. Contained within that "bungalow" was a document

reflecting the most recent 2011 test of the warning system. The expert obtained a photograph of that document.

The two experts authored a joint report containing five opinions. Paul Bodnar's sole opinion is that BNSF was negligent because the train did not sound its horn prior to entering the intersection. James Sottile expresses four opinions: (1) that the times on the data downloaded from the recorder are inaccurate; (2) that the active warning system gave only 13-14 seconds of warning, less than the 20 seconds required by 40 CFR § 234.225; (3) that the crossing signal system appliance test records provided by BNSF do not meet federal requirements [49 C.F.R. 234.273]; and (4) because the signal event recorder data fails to comply with federal regulations, the records are insufficient to determine the speed, horn and active warning systems at the time of the accident. Their joint Report was served on the Defendant, which has now moved to bar their testimony in full. A hearing on the motions was held on June 12, 2012.

## PROCEDURAL HISTORY

In order to fully comprehend the motions attacking the expert's Report, it is necessary to review the procedural and discovery history in this case. This lawsuit was filed on May 22, 2009. The Rule 16 scheduling conference was held on September 23, 2009. The parties' plan was approved. That plan called for Plaintiff to disclose expert witnesses by January 15, 2011, for Defendant to disclose expert witnesses by April 16, 2011, and for all discovery, fact and expert, to close on May 20, 2011. The Court was not involved in the case again until the Plaintiff moved for an extension of the schedule. Following a conference on February 17, 2011, the schedule was extended. The new schedule closed all discovery - fact and expert - on December 16, 2011.

On November 9, 2011, Plaintiff made the request (or, as Defendant characterized it, the demand) that Plaintiff's expert be allowed to conduct an inspection of the accident scene. Defense counsel agreed, but only with Plaintiff's counsel's representation that the expert's report would be provided before Thanksgiving and the deposition taken before Christmas.

On November 17, 2011, a month before the conclusion of all discovery, the chambers of the undersigned was contacted by counsel for BNSF, who orally requested a hearing. At that time, the parties' attorneys were present at the scene with Plaintiff's expert and a representative from BNSF. The expert had asked BNSF to open the "bungalow" in which the HCR event recorder is stored, a request to which BNSF objected as beyond what had been agreed to. A hearing was held, and the Court directed that the bungalow be opened for inspection and photography by the expert.

At 6:43 p.m. on December 16, 2011, the final day of discovery, Plaintiff served her experts' Report. On December 19, 2011, Defendant filed a motion to bar Plaintiff's experts on the grounds of untimeliness. On December 21, Defendant filed a supplement to that motion, stating that the expert had served a "revised" report on December 19 at 8:58 p.m. In response, Plaintiff attempted to justify its late production of the expert's report by pointing to what she characterized as BNSF's own delays in producing documents, its refusals to produce documents, and deficiencies in the documents that BNSF had produced. For good measure, Plaintiff included substantive arguments about the merits of the case.

In an Order entered on January 24, 2012, the Court entirely rejected Plaintiff's arguments, pointing out first that any disputes about the sufficiency of document production should have been brought to the Court's attention during discovery; by waiting until after discovery closed, any problems were waived. The Court found "puzzling" Plaintiff's lack of diligence in alerting the Court

to any such deficiencies, because Plaintiff's explanation for taking no depositions of BNSF personnel during the course of discovery was her counsel's belief that the case could be proved with only documents and experts.

After serious consideration being given to barring the experts for failure to timely disclose them and their Report, the Court decided that, in the interests of justice, the motion to bar should be denied. Instead, a new schedule was implemented, which allowed BNSF 7 days to review its production of documents to ensure that it had been complete, and allowed Plaintiff's experts 7 days thereafter to revise their Report if BNSF produced any additional documents. The Order cautioned, in bold, capital letters, that "NO EXTENSIONS OF THESE DEADLINES will be allowed without a detailed and substantial showing of good faith and due diligence."

BNSF produced no additional documents. Despite the strong cautionary language of the Order, on February 2 Plaintiff filed a motion to compel discovery. In that letter, counsel stated that he had been unavailable to work on this case until after January 30[2]. On January 31, he reviewed the discovery he had previously requested and served a supplemental request for what he believed was missing. BNSF counsel responded that no additional documents would be provided. Hence, the motion to compel.

As was pointed out in Defendant's response to this motion, Plaintiff's argument was based on two misconceptions. The first was that a defendant must, in its Rule 26(a) disclosures and supplements, provide documents that support the *plaintiff's* claim. That is not what the Rule requires. It requires a party to disclose information that will support "its" claims or defenses. Then, the opposing party uses those disclosures to formulate its subsequent written and oral discovery.

---

[2]His lack of availability was due to his annual out-of-the country ski trip, related travel, and subsequent activity on other cases. The Order denying his motion found that this did not constitute "due diligence" that would support an extension of the deadlines in any event.

6

The other misconception was that the Court's January 24 Order required BNSF to forgo any objections it had previously made and simply produce everything that Plaintiff had requested. The Order required BNSF to produce documents it "should have" produced during discovery. If objections were made and Plaintiff did not timely file motions with respect to those objections, then BNSF was not obligated to withdraw those objections to be in compliance with the Order. Plaintiff's motion was denied.

The January Order also set February 24 as the deadline for Defendant to depose Plaintiff's experts. BNSF took the depositions of the Plaintiff's experts in a timely fashion. Defendant's deadline to disclose its expert was March 9, 2012. The expert and his report were timely produced, but Plaintiff did not take his deposition.

## EXPERT WITNESSES GENERALLY

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703, as well as the Supreme Court's opinion in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir.2009).

Expert opinion testimony is admissible, so long as it conforms to Fed.R.Evid.702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise, if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Fed.R.Evid. 703, an expert may base his opinion on facts that are in the record or on facts that are presented to him or on facts that he personally observes. Under this Rule, expert

testimony must be rejected if it lacks an adequate basis in fact. Cella v. U.S., 998 F.2d 418 (7th Cir. 1993). Evaluation of the "soundness of the factual underpinnings" are crucial to the Court's gatekeeping function. Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000). An expert may not simply ignore evidence that does not support his opinion. See, e.g., Barber v. United Airlines Inc., 17 Fed. Appx.433 (7th Cir. 2001).

Under Daubert, the district court acts as a gatekeeper to ensure that expert testimony is both relevant and sufficiently reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999)); see also Mihailovich v. Laatsch, 359 F.3d 892, 918 (7th Cir.2004) and Bielskis v. Louisville Ladder, Inc., 663 F.3d 887, 893 (7th Cir.2011).

Whether to admit expert testimony rests within the discretion of the district court. See, e.g., Gen. Elec. Co. v. Joiner, 522 U.S. 136,(1997). Indeed, a district court has "wide latitude in performing its gate keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." Bielskis, 663 F.3d at 894. The inquiry under Rule 702 is "flexible." Id. "The goal of Daubert is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." Jenkins v. Bartlett, 487 F.3d 482, 489 (7th Cir.2007) (quoting Kumho Tire v. Carmichael, 526 U.S. 137, 152 (1999) Kumho Tire Co., 526 U.S. at 152). The court's role is that of "gatekeeper" with respect to expert testimony. Kumho Tire, 526 U.S. at 147.

District courts employ a three-part analysis before admitting expert testimony: the expert must be found qualified to provide an opinion on the particular subject; the expert's methodology must be found reliable; and there must be a relevant connection between the methodology and the opinion proffered. Daubert. at 509 U.S. at 589-92. In other words, the expert must be qualified and the opinions must be both relevant and reliable. Id. at 589.

8

The opinion must assist the trier of fact is some material way. See, Dhillon v. Crown Controls Corp., 269 F.3d 865, 871 (7th Cir. 2001). Where an expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion," the gap between the facts and the opinion is simply too great to be helpful or admissible. G.E. v. Joiner, 522 U.S. 136, 146 (1997).

Defendant does challenge the qualifications of Sotille and Bodnar to offer the expert opinion testimony at issue. For purposes of this Order, however, it is assumed that the two witnesses are qualified generally to testify about railroad safety and regulations. For the most part[3], Defendant's arguments as to the expert witness's qualifications either go to the substance or the weight of the opinions. The former is dealt with below; the latter is an issue for a trier of fact. The issue before the Court is the methodology used by and/or the substance of the opinions tendered by these witnesses.

## BODNAR'S OPINION

Bodnar was tendered as an expert in train operating practices regarding the horn and in interpretation of the locomotive event recorder data. His specific opinions concern the horn on the locomotive. In his report, he draws 3 conclusions: (1) the BNSF employee who downloaded the locomotive event recorder did not request the proper parameters for the download, rendering the download incorrect, incomplete and impossible to interpret; (2) the locomotive horn was removed

---

[3] Actually, there is some merit to the argument that Bodnar lacked the qualifications to offer his testimony about the horn data. He did not know what type of event recorder was being downloaded or what software was used to do so, and he relied on an undisclosed "partner" to double check his work. He also applied an inapposite federal regulation. But because his opinion is based solely on one row of missing data on that download (and not on a complete reading of the entire download), that serious lack in his qualifications really does seem to go more to the weight or lack thereof of his opinion than to his qualifications. Because his opinions themselves are so far below the requisite Daubert standard, I do not find it necessary to reach a definitive decision on this matter.

for testing; and (3) the locomotive horn did not sound for the required 15 seconds before it reached the intersection.

Bodnar's first opinion is based on the fact that the locomotive data download included no data showing activation of the horn, although the event recorder installed on this locomotive was capable of recording such data.. Bodnar asserts that, because federal regulations require recording this information, the failure to record such data indicates four possibilities: (1) the entries were deleted; or (2) the horn was never activated by the engineer; or (3) the horn failed mechanically; or (4) the event recorder failed to record activation of the horn by the engineer.

The regulation cited by Bodnar is inapplicable. This locomotive was manufactured in 1997. The regulation he cited applies to locomotives placed in service after October 1, 2009, a regulation that obviously has no applicability to a locomotive involved in an accident that occurred in 2007. The pertinent regulation does not require recording or retention of data relating to the horn on the particular locomotive involved in this case. 49 C.F.R. § 229.135. Bodnar's underlying assumption that the failure to record this data is a serious deficiency is without merit.

When Bodnar was confronted with the proper regulation during his deposition, he challenged whether it was a "current" regulation and said he would have to check with his partner to confirm that it was. Even if it was the current regulation, however, Bodnar opined that if BNSF had upgraded its recorder so that horn data *can* be recorded, it *should* be recorded. (Bodnar Deposition p. 67-8 ). This is contrary to law. See, <u>Waymire v. Norfolk and Western Ry. Co.</u>, 218 F.3d 773, 776 (7th Cir. 2000)(railroad not liable in FELA negligence action for unsafe speed and inadequate warning devices if railroad's conduct was consistent with regulations).

In addition to the lack of legal support for the proposition that the horn data was deficient, Bodnar suggests four other possibilities (besides the lack of any obligation to record the data) that

would explain why no horn data showed up. None of these four possibilities is viable, given the undisputed factual evidence in the record.

Bodnar admitted in his deposition that the first possibility - entries for the horn had been deleted - was wholly unsupported by any evidence (p.94), and no such evidence has been brought to the Court's attention. In addition, by its very definition, an event recorder must be tamper proof, so deletion of data would not appear to be a possibility anyway. This possibility is nothing more than pure speculation.

Bodnar insisted at his deposition that the lack of recorded data is evidence to support his second possibility - that the horn was never activated at all. This flies in the face of undisputed testimony from three witnesses - one of them completely independent of BNSF. Bodnar discounts witness testimony as unreliable, but this is not a situation of conflicting witness testimony; there is no contrary witness testimony. As BNSF points out, Bodnar's opinion on this point is like saying that if a tree falls in the forest but there is no video recording of it, the tree never fell even if witnesses observed it. An expert may not simply ignore evidence that does not support his opinion.

The third possibility posited by Bodnar - that the horn failed mechanically - is also belied by the evidence. The data download and the test result summaries reviewed by Bodnar during his deposition all show that the horn was tested as a matter of routine before the accident and again after the incident. No deficiency in the horn was found at any time. Bodnar cited no evidence at all to support this as a viable possibility - other than the lack of horn data on the download, and Plaintiff cites none in the response to this motion.

The fourth possibility stated by Bodnar was that the event recorder failed to record activation of the horn by the engineer. To the extent that this implies some malfunction in the event recorder,

no evidence is cited in the Report or in Plaintiff's response to this motion that would support such an implication and it is contrary to the test records produced by BNSF. It could also be read as simply reflecting the reality that activation of the horn was not recorded because there was no requirement to do so. If read in that manner, the statement attributes no wrongful conduct to BNSF. Neither interpretation of this "possibility" is helpful in the least. It could be read as simply reflecting the reality that activation of the horn was not recorded because there was no requirement that it be recorded. If read in that manner, the statement attributes no wrongful conduct to BNSF. Neither interpretation of this "possibility" is helpful in the least.

Not one of the four possibilities posited by Bodar supports his opinion that the data download from the event recorder on the locomotive was deficient because it did not record activation of the horn. This opinion is not only contrary to evidence but also without factual support, and it is legally unsupportable. It is therefore not admissible.

Bodnar's second opinion is that, contrary to good practices in the industry, the horn in the locomotive had been removed for testing, suggesting some sort of cover-up. When challenged by BNSF to support that assertion, he acknowledged that the documents he was shown during his deposition showed that the horn was still mounted on the locomotive when the testing was conducted. He testified, however, that he thought he had seen some other document showing removal of the horn and that he would identify it after his deposition if he located it. (p.112-13). It is not disputed: no such document has been produced.. This opinion is not based on any evidence and is therefore inadmissible.

Bodar's third opinion - that the locomotive horn did not sound for the required 15 seconds before it reached the intersection - is based on certain "calculations" that he performed once he

became convinced that the train was traveling at 26 miles per hour. He calculated that 10 seconds elapsed from the time the locomotive was put into emergency mode (which was when the engineer saw Ms. Madden's car on the tracks) to the time of the collision. From that statement, he concludes that the horn was not sounded during those 10 seconds and it is not possible to tell if the horn was sounded during the preceding 5 seconds of the required 15 second interval during which the horn was required to sound. There is no explanation, either in his report or in his deposition, for how he reached the conclusion that the horn was silent during those final 10 seconds. To the extent this conclusion is based on the fact that the sounding of the horn was not recorded, it is without merit as discussed above. If there is some other basis for the conclusion, it has nowhere been stated and, as noted earlier, is contrary to witness testimony. The leap of logic required to reach the conclusion is simply too great. This opinion is inadmissible.

One other problem is raised by Defendant, and that is the fact that Bodnar had his partner review his work, but Bodnar failed to disclose that fact until during his deposition. While this is a serious shortcoming - an expert must disclose all bases for his opinions, Fed.R.Civ.P. 26(a)(2)(B)(i) - in this situation it proves relatively harmless, since Bodnar's opinions are, in any event, inadmissible. Nonetheless, this shortcoming would in the ordinary course of litigation arguably be subject to Rule 37 sanctions. As noted above and as noted in previous orders, if Plaintiff intended to prove this case using only experts and documents, the failure to use care in timely and completely complying with the Rules is simply inexplicable.

Bodnar's opinion is not based on objective or scientific evidence but rather on Bodnar's purported knowledge of various safety rules that apply to railroads such as BNSF. His knowledge of the applicable rules demonstrated shortcomings, and he attempted to apply those rules without

factual support and with disregard to objective facts. His opinion that "the horn wasn't sounded in time for Ms. Madden to have that window of opportunity to step away" - which encompasses each of the three separate opinions discussed above - fails to meet the most basic standards of the Rules of Evidence and Daubert. The motion to bar Bodnar from testifying is therefore granted.

## SOTTILE'S OPINIONS

James Sottile's area of expertise is signals and train control. His portion of the Report offered 4 opinions relating to what the signal event recorder data download showed about the train's movement and the signal operations on the date in question.

His first "opinion" is that the wayside event recorder did not record in daylight savings time. This is not an opinion at all; it is an undisputed fact. BNSF does not assert that the recorder did record in daylight savings time.

Sottile's point in making this observation is that he cannot be certain of the timing of various events due to the failure to record in daylight savings time. He refused in his deposition to acknowledge that the time stamp on the signal event recorder downloaded data can simply be adjusted by one hour to obtain the correct time for the events recorded. He insisted that making this adjustment would be an "assumption," and he refused to make that assumption (p.124).

It is not an "assumption" to make this adjustment. If everyone agrees that the time stamps are in central time, not in central daylight time, then no assumption is required to determine the actual time that events occurred. It simply defies common sense to refuse to acknowledge this. His opinion on this matter is unreasonable and entirely unhelpful. It therefore fails to meet Rule 702's requirement that the opinion assist the jury; in fact, allowing this testimony would likely confuse the jury. It is, moreover, not relevant to any issue of negligence or causation. Because it is neither relevant nor helpful, this "opinion" is not admissible.

Sottile's second opinion is that the active warning system gave only 13-14 seconds of warning, less than the 20 seconds required by 40 CFR 234.225. This opinion is not based on any tests conducted by Sottile or on any data provided by BNSF. It is instead based on timing tests conducted by the decedent's children.

The children's test was conducted using their cell phones' stop watch function and their wristwatches to time a different train on a different day with no knowledge of the train's speed. They began timing when they heard the train, to see how long it was before the train entered the intersection. Plaintiff argues that timing devices such as cell phones and watches are accurate devices and that this test was certainly valid information on which the expert could rely.

BNSF does not challenge the accuracy of the timing devices. It challenges instead the ability of a lay person to use these devices to record accurately a time that begins with the lay person's hearing the horn of the train. When to start and stop the device would be key. As BNSF points out, when something is "heard" is "a completely subjective and highly available point in time." Did they start timing when they heard the train engine? heard the whistle? or, as the active warning system operates, when the train reached a certain point on the track? Where was the train when they stopped timing? Sottile testified (p.128) that if he had been the accident investigator and had the information about the children's timing, he would have used that information to order further testing. He did not testify that he would have based any conclusive opinion on their timing.

Moreover, when he was challenged by the documentary evidence at his deposition, Sottile agreed[4] that there were 30 seconds of active warning time prior to the accident. (p.88-90). This does not just undercut the opinion he stated in the Report; it contradicts it.

---

[4]Actually, what Sottile said was that the 30 seconds of warning came one hour before the accident, because he refused to make the adjustment for daylight savings time. As discussed above, that is absurd and is ignored.

15

Sottile also references that one of Madden's children recalled that someone said something at the coroner's inquest about the train's speed being 50-60 mph. There is no such evidence in the record. The Court assumes that if evidence of such speed was presented at the inquest, Plaintiff would have presented it to the Court, and this case would be a very different case. As it is, Sottile testified in his deposition that the locomotive event recorder showed that the train was traveling at 28 mph when it was placed into emergency mode by the crew (p. 142-143). He acknowledged that the data from the train dispatcher showed that the speed of the train "in the neighborhood " of 30 mph. (p. 55). All the documentary and testimonial evidence shows that the train's speed was 30 m.p.h. or less. For Sottile to have relied in any way on this type of secondhand information under these circumstances was simply unprofessional. No opinion testimony based on this comment will be allowed.

This Opinion is unsupported by the facts, is based on unreliable, unscientific and (and most-likely inadmissible) evidence, and was essentially abandoned by Sottile during his deposition. Sottile's opinion regarding the length of warning time provided by the active warning system at the intersection prior to the collision is not the product of reliable methods. It is neither legally nor scientifically sufficient to meet the standards of Daubert, and it is therefore barred.

Sottile's third opinion is that the test records for the crossing signal system "do not meet the federal requirements outlined in 49 C.F.R. § 234.273." This Regulation provides that results of inspections and tests are to be recorded in a particular way, signed by the employee, and "retained until the next record for that test is filed but in no case for less than one year from the date of the test." Id.

Sottile did not have access to the actual tests that were conducted on the locomotive in question because more than one year had passed and subsequent tests had been performed. This litigation was initiated more than one year after the accident. To the extent his "opinion" is critical of BNSF's failure to retain the actual test and inspection documents, his opinion is disregarded. BNSF was not required to and did not keep the actual test results. The summary of the tests and inspections from the time of the accident showed no problems or malfunctions of any part of the warning system.

Sottile also had access to the 2011 tests and inspections, which he criticized for lack of a signature and a missing decimal point on a battery test. These "deficiencies" were not reflective of malfunction of the event recorder or the warning system. Sottile himself testified in his deposition that if he had done an inspection and found the 2011 records, the deficiencies might have been criticized, but there would have been no warning issued to the railroad as there would be for serious problems.

Sottile does not dispute that this opinion has nothing whatsoever to do with the cause of the accident in question, but claims in his deposition that the deficiencies show "a culture, a pattern." (p.129-32). While there may be some situations in which deficient records would tend to show a culture or pattern of carelessness, a clerical error and a missing signature do not even come close to that level. These "deficiencies" are of no consequence in determining any issue in this action. Fed.R.Evid. 401(b). Sottile's opinion on this question is not relevant and is therefore barred.

Finally, Sottile opines that the signal event recorder data is insufficient to determine the speed, horn and active warning systems at the time of the accident, because (1) the data log is in "txt" format and can be manipulated because it was not encrypted; and (2) the data log time stamp does not reflect daylight savings time. The second question raises the same non-issue as it did above.

Standard time and daylight savings time can be synchronized without the need for any assumption whatsoever, and failure to make that synchronization is simply ridiculous. No more need be said on that issue.

With respect to his criticism that the data log might have been manipulated because of its format, this is pure speculation. The data log does not contain the information Sottile expected to see, so he guessed at a couple of possible reasons. When confronted, he stated that he had no evidence of any manipulation (p.135) and no reason at all to criticize the technician who downloaded the data. (p.139-140). He admitted that he had not seen certain documents before his deposition and that the reason he did not see the expected information was that the train remained in the intersection ("on the island") until after the download of data was completed. Because the event recorder is "event driven" and no "event" occurred from the time the train stopped until the download, no more data was recorded.

Once again, Sottile's opinion was based on incomplete information. Once he was shown additional documents, he back-pedaled and changed his opinion. He cannot be allowed to testify to an opinion that he has abandoned.

## CONCLUSION

For the reasons stated herein, the Motions to Bar [#56] [#58] are GRANTED in their entirety. The testimony of Mr. Bodnar and Mr. Sottile is barred.

ENTER this 13th day of July, 2012

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE